IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

MAGISTRATE NO. 19-124

LARRY J. GOISSE

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

## AND ARREST WARRANT

### INTRODUCTION

I, Eric K. Duble, being duly sworn according to law, depose and say:

1. I am employed as a Special Agent (SA) with the Department of Justice (DOJ), Drug Enforcement Administration (DEA), and have been so employed since March 2004. Prior to that time, I received a Bachelor's Degree in Criminal Justice and a Graduate degree in Organizational Leadership. I am currently assigned to the DEA Pittsburgh District Office, Tactical Diversion Squad (TDS) and have been so assigned since March 2016. Prior to transferring to the Pittsburgh, I was a member of the Philadelphia Field Division, Tactical Diversion Squad from approximately June 2010 through March 2016. From September 2004 through June 2010, I was assigned to the DEA San Diego Field Division working as a member of the Organized Crime Drug Enforcement Task Force (OCDETF) Strike Force/Enforcement Group 3, which specialized in Major Mexican Drug Traffickers. I have the following qualifications:

2. Training: I attended the 17 week DEA Training Academy in Quantico, Virginia, and I am familiar with the manner in which controlled substances, including Adderall and other amphetamine based pharmaceuticals, are manufactured, packaged, distributed, marketed and consumed. I received extensive formal training in controlled substance investigations to include informant handling, debriefing of drug violators and training in the area of surveillance and counter

1

surveillance. I also received extensive legal instruction regarding the Controlled Substances Act, Fourth Amendment search and seizure, and execution of search warrants. I have continued my training by attending and successfully completing DEA sponsored courses in topics such as: Investigative Techniques for Diversion Cases, Diversion Comprehensive Regulatory Investigations, Advanced Agent Training, Complex Conspiracy Investigations, Financial Investigations and Telecommunications Exploitation Investigations.

3. <u>Experience</u>: I have initiated and participated in numerous local, national and international investigations of criminal violations of the Controlled Substances Act (CSA) to include: the unlawful importation, possession with intent to distribute, distribution of controlled substances, and distribution of controlled substances resulting in death. I have recruited, developed, interviewed and managed informants who have provided information and conducted controlled drug purchases. I have authored, executed, and led teams of Agent and Task Force Officers (TFO) in numerous search and arrest warrants. I have arrested well over 100 CSA violators, interviewed hundreds of suspects, witnesses, informants and sources of information. I have conducted physical, electronic, and video surveillance. I have personally purchased controlled substances, including cocaine, heroin, methamphetamine, marijuana, and oxycodone in an undercover capacity. While acting in an undercover capacity I utilized telephonic communication facilities to negotiate drug prices, sales, purchases, and to arrange meet times and locations to conduct those transactions. I am familiar with the organizational structure of drug trafficking organizations and the methods used by persons who buy and sell controlled substances, such as, the language, terminology, street slang, and the prices and packaging used to distribute controlled substances. On January 13, 2016, I was certified as an expert witness in the subject matter of pharmaceutical and diversion related cases in <u>U. S. vs. Michael Katzin</u>, by United States

District Judge for the Eastern District of Pennsylvania, the Honorable Judge Pratter. In addition to the above formal training, I have also worked with and consulted numerous agents and law enforcement officers who have investigated drug distribution and trafficking throughout Southern California, Eastern Pennsylvania, Western Pennsylvania, and various other districts throughout the United States.

4.      This Affidavit is submitted in support of a Criminal Complaint and arrest warrant for Larry J GOISSE Jr.

5.      Based on my personal knowledge of and participation in this investigation, including interviews with former employees of GOISSE's medical practice, a review of pharmacy data from pharmacies within the state of Pennsylvania, information received from Pennsylvania Department of State Bureau of Enforcement Investigation and State Licensing, and discussions with other law enforcement officers participating in this investigation, I am familiar with the below-detailed facts and circumstances. Since this affidavit is submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact known regarding this investigation.

## BACKGROUND

6.      Larry J. GOISSE is a Certified Registered Nurse Practitioner (C.R.N.P.) with a speciality in Adult Psychiatric Mental Health, with two currently suspended licenses in the Commonwealth of Pennsylvania (Licenses Numbers: RN577684 and SP014433), and an active DEA registration number (MG3392189) which allows him to prescribe Schedule II through V Controlled Substances to his patients, as long as he, in part, maintains a valid state medical license. GOISSE currently owns and operates Prime Psychiatric Care, LLC (PPC) with medical offices located at 6425 Living Place, Suite 2085, Pittsburgh, Pennsylvania; and 201 Penn Center Boulevard, Pittsburgh, Pennsylvania. The Linkedin web page for PPC (http://linkedin.com) states

that Larry GOISSE is the Chief Executive Officer at PPC. The Psychology Today web page for PPC (http://psychologytoday.com) states they "provide diagnosis and medication management for mental health illness such as depression, anxiety disorders, ADHD, psychotic disorders, bipolar, and substance abuse." According to the same web page, "PPC specializes in treating depression, anxiety disorder, ADHD, mood disorders, and substance abuse by providing appts in office or by tele-conference allowing patients to do their appointments. We take most commercial insurances including Highmark, UPMC, Aetna, Cigna, and medicare plans."

7. In November and December 2018, DEA TDS members received information from the Pennsylvania Department of State Bureau of Enforcement and Investigations that they received several complaints from former employees of PPC indicating GOISSE was practicing medicine without a valid state medical license.

8. In December 2018, your affiant learned GOISSE's medical licenses were suspended as a result of Nolo Contendere misdemeanor convictions for possession of a controlled substance and driving while operating privileges are suspended or revoked, on July 25, 2018. Your affiant queried law enforcement databases and learned GOISSE was arrested by the West View Borough Police Department on December 29, 2017, after an officer encountered GOISSE passed out behind the wheel of running vehicle. During the encounter the officer learned GOISSE was operating the vehicle with a driving under the influence (DUI) suspended license. The officer asked GOISSE to exit the vehicle, and subsequent to a pat down search, observed a glass pipe protruding from his pant pocket. When the officer retrieved the glass pipe he noted the pipe was burnt on one end. The officer also seized a clear plastic bag, later determine to contain methamphetamine, from the same pant pocket. GOISSE was released from the scene and subsequently charged via Summons. On July 25, 2018, GOISSE subsequently plead Nolo

Contendere to the aforementioned charges, and as a result of these convictions subsequently had his Pennsylvania state medical licenses indefinitely suspended for no less than three years.

9. In December 2018 and again on January 28, 2019, your affiant reviewed Pennsylvania pharmacy dispensing records for GOISSE from approximately September 11, 2018 through the date of each query, the most recent of which was on January 28, 2019. The records indicated multiple Schedule II and IV controlled substance prescriptions authorized by GOISSE were dispensed from various Pennsylvania pharmacies, the most recent of which was for January 24, 2019.

10. In January 2019, DEA investigators interviewed a total of seven former employees (Cooperating Witnesses or CW) of GOISSE, many of whom resigned after learning about his license suspensions. Some observed GOISSE after September 11, 2018, treat and prescribe controlled substances to patients. Some provided investigators with copies of their resignation letters which stated one of the reasons for their resignation was due to GOISSE's loss of his state medical license. Some Cooperating Witnesses provided copies of electronic communications they had with GOISSE which show GOISSE knew he was practicing medicine without a valid medical license. All the Cooperating Witnesses appeared to provided truthful and credible information much of which was independently corroborated by other investigative methods. Many of Cooperating Witnesses are also medical professionals with valid state medical licenses, and some of whom also possess valid DEA Registrations.

11. Based on information obtained from the Pennsylvania Department of State Bureau of Enforcement and Investigations, pharmacy data, information provided by multiple Cooperating Witnesses and other information obtained through DEA investigation, Your affiant believes there is probable cause that GOISSE is practicing medicine in the Western District of Pennsylvania

without a valid Pennsylvania state medical license and prescribing controlled substances outside the scope of acceptable medical practice in violation of Title 21 U.S.C. Section 841(a)(1).

## PROBABLE CAUSE

12. In December 2018, DEA investigators obtained copies of GOISSE's state medical licenses status from the Pennsylvania Department of State Bureau of Enforcement and Investigations via the Pennsylvania Bureau of Professional and Occupational Affairs Database. DEA investigators also obtained supporting documents and court records from the Pennsylvania Department of State Bureau of Enforcement and Investigations relating to GOISSE's state medical licenses suspensions. Your affiant reviewed those records and noted both of GOISSE's state medical licenses were suspended by the Pennsylvania State Board of Nursing (Board) pursuant to an Order of Automatic Suspension by the Board on September 11, 2018. On January 30, 2019, your affiant checked the Pennsylvania Department of State Licensing System and noted GOISSE's state licenses are still currently suspended.

13. On January 28, 2019, your affiant reviewed data reported by Pennsylvania pharmacies for Schedule II and IV prescriptions authorized by GOISSE from September 11, 2018 through January 28, 2019. The review revealed GOISSE continues to write Schedule II and IV prescriptions to his patients without a valid state medical license. More specifically, the review revealed GOISSE authorized approximately four hundred twenty-nine prescriptions for Schedule II and/or IV controlled substance to his patients, with the last prescriptions written on January 24, 2019. Of those approximate four hundred twenty-nine prescriptions written or electronically prescribed by GOISSE, approximately two hundred ninety-four prescriptions totaling 13,177 tablets were for a Schedule II drugs containing the active and controlled substance amphetamine. Some of these drugs include, Adderall®, Vyvance®, Mydaysis®, and dextroamphetamine in various milligram strengths.

14. To date, DEA investigators have physically or electronically communicated with many of the pharmacies where GOISSE authorized prescriptions were filled from September 11, 2018 through the present, and collected their dispensing records associated with GOISSE authorized prescriptions. Much of the collected pharmacy data corroborates the data reported by the Pennsylvania pharmacies for Schedule II and IV prescriptions. While collecting the pharmacy data at some of the pharmacies investigators learned from the pharmacists that some of GOISSE's authorized prescriptions were telephonically called into the pharmacies by an employee at PPC, named "Debbbie" or "Debra" (known to your affiant as Debra MORRIS, a licensed nurse, employed at PPC and the mother of GOISSE). According to a pharmacist at B.S. Pharmacy, MORRIS called the pharmacy on December 14, 2018, and ordered a prescription under GOISSE's DEA Registration for patient named R.F. for Kolonpin®, a brand name drug for a benzodiazepine containing the Schedule II controlled substance Clonazepam. DEA investigators obtained a copy of the recorded call for evidentiary purposes. While collecting the pharmacy data, some of the pharmacists were notified by investigators that GOISSE does not have a valid state medical license, and has not since September 11, 2018. Those pharmacists whom were notified indicated to investigators they would not fill any additional prescriptions authorized by GOISSE while his state medical licenses are suspended. This indicates to your affiant that the pharmacists know a prescription authorized by a DEA Registrant to be legal must be written by practitioner with the legal authority to do so, within the scope of acceptable medical practice and for a legitimate medical purpose. The fact GOISSE does not maintain a valid state medical license means he does not have the legal authority to authorize prescriptions for controlled substances; therefore, any prescriptions authorized by GOISSE is an illegal prescription.

15. In January 2019, DEA investigators conducted several interviews with former PPC employees. One such interview occurred on January 17, 2019, with DEA Cooperating Witness 1 (CW1). CW1 is fully licensed Certified Registered Nurse Practitioner (C.R.N.P.) who agreed to work for GOISSE at PPC doing tele-medicine (tele-medicine can be described as treating patients telephonically and/or video chats instead of a face-to-face, in-person office visit). Much of the information provided by CW1 was independently corroborated by investigators through other investigative methods; and therefore, is believed by your affiant to be credible.

16. According to CW1, CW1 started work for GOISSE and PPC on approximately August 3, 2019. CW1 stated he/she typically worked approximately one hour a week treating approximately four to five patients of PPC via tele-medicine a week. CW1 stated in approximately mid September 2018, GOISSE contacted CW1 and told CW1 his mother was sick and apparently going to be placed in hospice. GOISSE allegedly asked CW1 to treat more of his patient so he could care for his mother. CW1 subsequently agreed, believing the increase in patient load would only last a couple of weeks at most. CW1 informed investigators he/she saw at most approximately eight to ten patients a week during that time. CW1 claimed during this time frame he/she received voice phone calls and text messages from an employee at PPC named Debra MORRIS. CW1 stated, he/she subsequently learned from another employee at PPC that MORRIS was the mother of GOISSE and soon figured out GOISSE had lied about his mother's condition.

17. CW1 also told investigators during the week of approximately October 15 or 18, 2018, CW1 started to notice new patient charts opened in his/her PPC electronic patient record system. According to CW1, the new charts indicated CW1 treated and wrote prescriptions to those patients. CW1 was adamant he/she did not create the patient charts, treat those particular patients, and/or did not prescribe them medications. According to CW1, another office employee searched

the PPC computer system and informed CW1 the system indicated CW1 as the provider for patients, but GOISSE was the authorizer. CW1 told investigators GOISSE was behind the whole thing and believed he went into their electronic patient file system and created the charts under CW1's name and authorized their medication on CW1's behalf without ever verifying or consulting with CW1. CW1 stated GOISSE falsified the records to show CW1 saw the patients when in reality CW1 did not see or treat those patients.

18. CW1 claimed approximately one week after that incident he/she received word from other employees that two other office employees resigned from the practice. CW1 told investigators he/she last saw patients for PPC on October 24, 2018. CW1 claimed over that weekend he/she communicated with other employees from the practice. CW1 told investigators they shared their concerns as well as suspicious incidents associated with GOISSE. CW1 told investigators an employee told CW1, GOISSE's state medical license was suspended. CW1 stated after that conversations he/she searched GOISSE in the Pennsylvania State Licensing Board of Medicine website, and discovered GOISSE's state medical license was in fact suspended in September. CW1 claimed he/she then told the other employees about GOISSE's license suspension, and they all subsequently agreed to quit the practice.

19. CW1 provided DEA investigators with screen shot photographs of electronic communications CW1 had with GOISSE relating to his/her resignation. In that conversation CW1 stated, "Larry unfortunately I have to resign from PPC (effective today). I know that your license is suspended. I cannot risk jeopardizing my license..." GOISSE responded, "Exactly how does my license jeopardize yours? I was acquitted from a dui and I challenged the suspension." Based on the information provided by CW1 and the admission by GOISSE, your affiant believes GOISSE

knew his state medical license was suspended and was not supposed to be practicing medicine, and by doing so did so operate outside the scope of acceptable medical practice.

20. On January 18, 2019, DEA investigators interviewed Cooperating Witness 2 (CW2). CW2 is fully licensed Certified Registered Nurse Practitioner (C.R.N.P.) who agreed to work for GOISSE at PPC treating adult psych mental health patients. CW2 stated he/she was new to mental health and GOISSE agreed to mentor and teach CW2 how to treat the patients. Much of the information provided by CW2 was independently corroborated by investigators through other investigative methods; and therefore, is believed by your affiant to be credible.

21. CW2 stated he/she started work at PPC for GOISSE in approximately mid-late October early November 2018. CW2 stated the first couple of days at PPC GOISSE and CW2 together saw approximately five to ten patient on each day. CW2 stated on the subsequent days he/she typically handled and treated half of the patients at the practice while GOISSE saw and treated the other half. CW2 estimated the number of patients he/she saw each day to be approximately ten patients. CW2 stated on approximately day four of his/her employment GOISSE did not show up at the practice when he had patients office visits scheduled. CW2 stated other office staff employees told CW2 this was not the first time GOISSE did not show up on days he was scheduled to see patients.

22. CW2 told investigators in approximately his/her third week at PPC, several employees told CW2 GOISSE lost his medical license. CW2 stated he/she confronted GOISSE about his loss of licenses and GOISSE "laughed it off." CW2 told investigators shortly after their conversation about GOISSE's medical license, GOISSE provided CW2 with a non-disclosure agreement and wanted CW2 to sign the agreement. CW2 stated he/she refused to sing the agreement and subsequently resigned from PPC on October 24, 2018, and noted he/she never

received a payment from PPC for services rendered. Your affiant believes, in part, based on CW2's statement and other information gathered throughout this investigation GOISSE knowingly practiced medicine without a valid state medical license, and in doing so did so outside the scope of acceptable medical practice.

23. On January 23, 2019, DEA investigators interviewed Cooperating Witness 3 (CW3). CW3 is fully licensed Registered Nurse who agreed to work for GOISSE at PPC treating adult psych mental health patients. CW3 started to work for GOISSE at PPC in approximately June 2018, and resigned from PPC on October 23, 2018, after CW3 learned GOISSE's state medical license was suspended. CW3 helped to run the practice by pulling patient charts, scheduling patient appointments, and answering the phones. Much of the information provided by CW3 was independently corroborated by investigators through other investigative methods; and therefore, is believed by your affiant to be credible.

24. CW3 told investigators GOISSE instructed CW3 to train his mother, Debra MORRIS a licensed practical nurse (LPN), how to operate or run the practice. CW3 stated MORRIS worked periodically throughout CW3's employment at PPC. CW3 also indicated he/she worked at both practice locations.

25. CW3 told investigators in approximately September and October 2018, there was a significant rapid decline in GOISSE's personal appearance, hygiene, and dependability. CW3 stated GOISSE did not show for some of his appointments, and sometimes kept patients waiting up to two-hours. When CW3 contacted GOISSE by telephone to ask where he was and to inform him he had patients waiting, GOISSE often asked CW3 to request the patient to do a tele-medicine conference. CW3 stated if the patient agreed, CW3 set the patient up in GOISSE's office for the tele-medicine conference.CW3 stated the tele-medicine conference typically lasted five to ten

minutes. CW3 stated GOISSE's office was often a mess, with patient files and records strewn about his desk, with exposed personal information to the patient partaking in the tele-medicine conference. While CW3 gathered the patient files and/or records, CW3 sometimes found glass pipes with a wire-like material in one of the ends that were burnt, charred, blackened, and was consistent as a crack-pipe used to smoke crack cocaine or methamphetamine. CW3 stated he/she took the crack-pipe(s) and threw them away. CW3 claimed this happen several times. CW3 stated GOISSE never asked about the missing crack-pipes.

26. CW3 stated in September/October 2018, CW3 physically witnessed GOISSE practice medicine and call in prescriptions for patients. CW3 stated GOISSE instructed CW3 to call prescriptions into a pharmacy on his behalf using another C.R.N.P.'s name and DEA registration. CW3 and another office employee checked the Pennsylvania Prescription Drug Monitoring Program (PDMP) for prescriptions called in or under the other C.R.N.P.'s name because they wanted to make sure his/her licensing did not get called into question. This made CW3 and the other employee suspicious, and when they first started to look into GOISSE's state medical license. According to CW3 they reviewed the PA Commonwealth Licensing website and discovered GOISSE's licensure was suspended since September 11, 2019. CW3 and the other employee called other the other medical staff of PPC and informed them about GOISSE's suspended license and their concerns he was practicing medicine and prescribing controlled substance as an unlicensed practitioner. On October 23, 2018, CW3 and the office manager at PPC resigned. Based on the information provided by CW3, your affiant believes GOISSE knowingly practiced medicine without a valid state medical license, and in doing so did so outside the scope of acceptable medical practice.

27. On January 29, 2019, DEA investigators interviewed Cooperating Witness 4 (CW4). CW4 is fully licensed Certified Registered Nurse Practitioner (C.R.N.P.) who agreed to work for GOISSE at PPC treating adult psych mental health patients. CW4 stated he/she was new to mental health as a practitioner and GOISSE agreed to mentor and teach CW4 how to treat the patients; however, only sat with CW4 for approximately ten minutes. Much of the information provided by CW4 was independently corroborated by investigators through other investigative methods; and therefore, is believed by your affiant to be credible.

28. CW4 started at PPC in approximately November/December 2018, and initially agreed to patient medication checks (refills) and fifteen to twenty minute tele-medicine counseling for $90 and hour. CW4 stated he/she started to see patients in person on January 21, 2019, for PPC at the Bakery Square location. CW4 stated GOISSE told him/her that he would shadow CW4 during counseling sessions, instruct CW4 how to chart, and inform CW4 of the prescribing methods for patients. Instead, CW4 indicated GOISSE spent approximately ten minutes with CW4 and told CW4 that he has some errands to run and he never returned.

29. CW4 told investigators on January 28, 2019, CW4 was sent to work at the PPC office located at 201 Penn Center Boulevard, Building 1, Floor 4, Suite 450, Pittsburgh, PA 15235 to treat patients. CW4 stated upon arriving there were patients who had waited for two-hours to see GOISSE, but he never showed up for his appointments. CW4 subsequently treated the patients. CW4 stated during one of the counseling sessions with one of the patients, the patient informed CW4 that GOISSE was practicing medicine with an invalid NP license. CW4 claimed after the session and later that night, he/she spoke to a collogue who also used to work for GOISSE at PPC. CW4 stated he/she soon discovered GOISSE's medical license was suspended.

30. CW4 told investigators he/she contacted GOISSE after it was confirmed his licenses were suspended. CW4 told GOISSE he/she knew that GOISSE's licensure was suspended and he was treating/prescribing patients without a valid state medical license. CW4 asked GOISSE who his supervising physician was and GOISSE diverted the conversation to something else and never answered CW4. CW4 questioned GOISSE again about his supervising physician, and GOISSE told CW4 he was hiring a [supervising authority] in approximately a month. GOISSE asked CW4 "don't you have a supervising physician?" CW4 stated his/her supervising physician works for UPMC at his/her other full-time position and that he/she could/would not legally be allowed to use his/her supervising physicians information. CW4 stated GOISSE admitted to being arrested for a driving under the influence (DUI) charge last year, but claimed he was acquitted of those charges and that he was trying to work through the process to get his license back. CW4 told GOISSE that he/she was done working for PPC/GOISSE and that he/she resigned on January 29, 2019. Based on the information provided by CW4, your affiant believes GOISSE knowingly practiced medicine without a valid state medical license, and in doing so did so outside the scope of acceptable medical practice.

31. There were several other former employees of PPC who worked for GOISSE and PPC whom resigned immediately after learning he was practicing medicine without a valid state medical license. The information the other former employees provided corroborates the information provided by CW1, CW2, CW3, and CW4. The statements provided by all Cooperating Witnesses, coupled with the pharmacy data indicate to your affiant that GOISSE has and currently is still practicing medicine in the Western District of Pennsylvania without a valid Pennsylvania state medical license, and in doing so is acting outside the scope of acceptable medical practice.

## CONCLUSION

32. Based upon the foregoing, I believe that there is probable cause to believe that Larry J. GOISSE engaged in the illegal distribution of Schedule II and IV prescriptions from September 11, 2018 through at least January 24, 2019, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(C).

33. The above information is true and correct to the best of my knowledge, information and belief.

Eric K. Duble, Special Agent
Drug Enforcement Administration

Sworn and subscribed before me,
this 31st day of January, 2019.

United States Magistrate Judge